# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

CHARLES DEMPSY MILES, JR      )
BARBARA JEAN MILES          )   District Court Case No.  09 CV
02973JLK                          )

                                )
CHARLES DEMPSY MILES, JR.     )
BARBARA JEAN MILES,         )
              Appellants      )
v.                             )

                                )   Bankruptcy Case No. 05-14002ABC
WELLS FARGO BANK, NA.,       )
SUCCESSOR BY MERGER TO WELLS )
FARGO BANK MINNESOTA, N.A., AS )
TRUSTEE F/K/A NORWEST BANK   )
MINNESOTA, N.A. AS TRUSTEE FOR )
THE REGISTERED HOLDERS OF    )
TERWIN MORTGAGE TRUST, ASSET )
BACKED PASS-THROUGH         )
CERTIFICATES,                  )
                Appellee     )

## ADDENDUM

### Cases

A.  *Am. Express Bank, FSB v. Askenaizer (In re Plourde)*, 418 B.R. 495, 506 (BAP 1st Cir. 2009)
B.  *In re: Bohrer*, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001)
C.  *In re Jacobson*, 402 B.R. 359, 367-8 (Bankr. Wash. 2009)
D.  *McEwen v. City of Morman*, 926 F. 2d 1539, 1539, 1553-54 (10th Cir. 1991)
E.  *MERS, Inc. v. Chong*, No. 09-661 (D. Nev. 2009)
F.  *MERS, Inc v. Medina*, Dist. Ct. Case No. 09-CV00670; 2009 U.S. Dist LEXIS 121998 (U.S. Dist. Nev.2009)
G.  *Moothart v. Bell*, 21 F. 3d 1499, 1504 (10th Cir. 1994)
H.  *In re Padilla*, 2008 Bankr. Lexis 2616, (October 14, 2008)
I.  *Pursifull v. Eakin*, 814 F. 2d 1501, 1504, 1506 (10th Cir. 1987)
J.  *Torgenrud v. Wolcott (In re Woldcott)*, 194 B.R. 477, 483 (Bankr. D. Mont. 1996)

### Statutes & Rules

K.  11 U.S.C. §§ 101, *et seq* (not included in Addendum due to size section)
L.  11 U.S.C. § 362 (c) (2) (C)
M.  11 U.S.C. § 362 (d)
N.  11 U.S.C. § 362 (d) (1) &(2)
O.  11 U.S.C. § 362 (d) (2) (B)
P.  11 U.S.C. § 727(not included in Addendum due to size section)
Q.  C.R.S. § 38-38-101 (1) (b) (I)
R.  Fed. R. Evid. 801 (d) (2)





LEXSEE 418 BR 495

**ROBERT G. PLOURDE and DEBRA A. PLOURDE, Debtors. AMERICAN EXPRESS BANK, FSB, Appellant, v. MICHAEL S. ASKENAIZER, Chapter 7 Trustee, Appellee/ Cross-Appellant, v. eCAST SETTLEMENT CORPORATION, Cross-Appellee.**

BAP NOS. NH 08-093, 08-096

UNITED STATES BANKRUPTCY APPELLATE PANEL FOR THE FIRST CIRCUIT

*418 B.R. 495; 2009 Bankr. LEXIS 3136; 62 Collier Bankr. Cas. 2d (MB) 877*

**October 19, 2009, Decided**

**PRIOR HISTORY:** [**1]
Appeals from the United States Bankruptcy Court for the District of New Hampshire. (Hon. J. Michael Deasy, U.S. Bankruptcy Judge). Bankruptcy Case No. 05-15221-JMD.
*In re Plourde, 397 B.R. 207, 2008 Bankr. LEXIS 3086 (Bankr. D.N.H., 2008)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant creditor sought review of an order from the United States Bankruptcy Court for the District of New Hampshire, which disallowed its general unsecured claim for $ 42,452 in credit card debt. The chapter 7 trustee appealed the bankruptcy court's order allowing another credit card creditor's general unsecured claim in the amount of $ 6,309. The trustee also appealed the court's denial of his request for an award of attorney's fees.

**OVERVIEW:** During the appeal, the trustee acknowledged that the estate was indebted to each credit card creditor, so the issue of allowance was no longer in play. However, the trustee pressed his point that neither creditor provided sufficient evidence to support payment as a general unsecured claim. He argued that each creditor's claim comprised principal, interest, and other fees such that, without a detailed itemization of the basis and timing of their charges, the court could not determine the priority distribution their claims should be accorded. The court agreed that the claims were not entitled to share as general unsecured claims because both creditors failed to prove their entitlement to the distributional status they sought. The creditors not only denied that interest or other charges were included in their claims, they failed to provide itemizations. Thus, the court determined that the claims were entitled to no better treatment than the priority provided under *11 U.S.C.S. § 726(a)(4)*. As to attorneys' fees, because the trustee did not demonstrate he raised more than a perfunctory argument below, the court found that he waived that argument.

**OUTCOME:** The court found both claims at issue to be allowable but ordered that each was entitled to treatment under *11 U.S.C.S. § 726(a)(4)* instead of *11 U.S.C.S. § 726(a)(2)*. The court also affirmed the disallowance of the trustee's request for a fee award.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*
[HN1] A United States Bankruptcy Appellate Panel has jurisdiction to hear appeals from: (1) final judgments, orders, and decrees; or (2) with leave of court, from certain interlocutory orders. *28 U.S.C.S. § 158(a)*. A decision is final if it ends the litigation on the merits and leaves nothing for the court to do but execute the judgment, whereas an interlocutory order only decides some intervening matter pertaining to the cause, and requires further steps to be taken in order to enable the court to

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 4 of 33

Page 2

418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

adjudicate the cause on the merits. A bankruptcy court's order allowing or disallowing a claim is final and, thus, appealable. Similarly, an order denying a trustee's request for a fee award is final and appropriate for our review.

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Clear Error Review*
*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > De Novo Review*
[HN2] A United States Bankruptcy Appellate Panel reviews a bankruptcy court's findings of fact for clear error and conclusions of law de novo. Interpretations of the bankruptcy code are legal questions subject to de novo review.

*Bankruptcy Law > Liquidations > Estate Property Distribution > Distributions Among Unsecured Classes*
[HN3] *11 U.S.C.S. § 726(a)(4)* subordinates allowed claims for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages to the extent they are not compensation for actual pecuniary loss.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
[HN4] See *N.H. Rev. Stat. Ann. § 361-C:2.*

*Bankruptcy Law > Claims > Allowance*
[HN5] *11 U.S.C.S. §§ 501* and *502* govern the filing and allowance of creditor claims in bankruptcy proceedings. When a debtor files for relief, each creditor is entitled to file a proof of claim against the debtor's estate pursuant to *§ 501.* Once a creditor has filed such a proof, the bankruptcy court must determine whether the claim is allowed. *Section 502(a)* provides that a proof of claim filed under *§ 501* is deemed allowed unless a party in interest (often the trustee) objects. However, even where a party in interest objects, the court shall allow the claim unless one of nine exceptions enumerated in *§ 502(b)* applies.

*Bankruptcy Law > Claims > Allowance*
[HN6] See *11 U.S.C.S. § 502(b).*

*Bankruptcy Law > Claims > Proof > Content, Evidence & Form*
[HN7] The Bankruptcy Code itself does not prescribe what documentation, if any, must accompany a proof of claim. However, the Federal Rules of Bankruptcy Pro-

cedure, which provide the procedural framework for the filing and allowance of claims, regulate the form, content, and attachments for proofs of claim. *Fed. R. Bankr. P. 3001(a)* requires that a proof of claim be a written statement that conforms substantially with the appropriate Official Form, which is Official Form 10. *Fed. R. Bankr. P. 3001(c)* directs creditors filing a proof of claim based on a writing to attach either the original or a duplicate of the writing. Official Form 10 instructs the claimant to attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of liens. The creditor is required to explain any failure to attach documents based on a lack of availability. In addition, if the required documents are too voluminous, the creditor may attach a summary. Official Form 10 further requires the claimant to specify whether the claim includes any interest or other charges in addition to the principal amount of the claim, and if so, to attach an itemized statement of all interest or additional charges.

*Bankruptcy Law > Claims > Objections*
*Bankruptcy Law > Claims > Proof > Effects & Procedures*
[HN8] *Fed. R. Bankr. P. 3001(f)* sets the evidentiary effect of a properly filed proof of claim (i.e., one that complies with the requirements of the rule and form), stating that a claim filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim. *Fed. R. Bankr. P. 3001(f).* In order to rebut the prima facie evidence a proper proof of claim provides, the objecting party must produce substantial evidence in opposition to it. If the objection is substantial, the claimant is required to come forward with evidence to support its claims and bears the burden of proving its claims by a preponderance of the evidence.

*Bankruptcy Law > Claims > Allowance*
[HN9] *11 U.S.C.S. § 502* lists nine bases for disallowing claims. Failure to file a proof of claim meeting the requirements of *Fed. R. Bankr. P. 3001* and Official Form 10 is not among them. Neither *Fed. R. Bankr. P. 3001* nor *11 U.S.C.S. § 502* provides that a proof of claim which does not conform with the requirements of the rule and/or the form be disallowed due to such noncompliance, nor do they otherwise address the consequence of filing a proof of claim that fails to meet all of the rule's requirements. Rather, when the proof of claim is not filed in accordance with the Federal Rules of Bankruptcy Procedure, it does not constitute prima facie evidence of

418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

Page 3

the validity and amount of the claim, and the burden of proof rests on the claimant.

*Bankruptcy Law > Claims > Allowance*
*Bankruptcy Law > Liquidations > Estate Property Distribution > Distributions Among Unsecured Classes*
[HN10] Under *11 U.S.C.S. § 502(b)*, allowance of a claim constitutes a determination of the amount of such claim. Parties often conflate a claim's allowance with establishing its distributional entitlement. This is understandable. In most cases, the question simply is whether - and how much - a claimant is owed by a debtor (and thus the estate). When a claim is asserted to be a general unsecured claim, issues about its entitlement to that priority in the bankruptcy distributional scheme do not often arise. But a claim's allowance merely establishes it as a charge against the estate. Its distributional priority is separately addressed by *11 U.S.C.S. § 726(a)*. In each instance the priorities set by *§ 726(a)* dictate the order in which allowed unsecured claims are to be paid. A claim's allowance stands for little in terms of actually getting paid if, in the course, the claimant has not also established its claim's *§ 726(a)* priority.

*Bankruptcy Law > Liquidations > Estate Property Distribution > Distributions Among Unsecured Classes*
[HN11] See *11 U.S.C.S. § 726(a)*.

*Bankruptcy Law > Liquidations > Estate Property Distribution > Distributions Among Unsecured Classes*
[HN12] An unsecured creditor seeking administrative claim treatment within *11 U.S.C.S. § 726(a)(1)* (ahead of the general pool of unsecured creditors) has the burden of proving the elements that qualify it for that status.

*Bankruptcy Law > Liquidations > Estate Property Distribution > Distributions Among Unsecured Classes*
[HN13] A party in interest may object to a claimant's right to be paid as a general unsecured claim. In such instances, when a substantial objection to the claimed priority is interposed, the claimant shoulders the burden of proving its entitlement to payment under *11 U.S.C.S. § 726(a)(2)*. Once a claim is deemed allowed, its priority must be determined. In most Chapter 7 cases, a claim holder's "rung" on the priority "ladder" created under *§ 726* is crucial because the estate assets are limited. There are usually insufficient assets to pay all claimants in full, and *§ 726(b)* mandates pro rata distribution among all claimants at each level, or rung of the priority ladder, with an absolute priority cutoff. All allowed claimants at a particular level or rung of the ladder must be paid in

full before any estate funds can be distributed to holders of claims at the next lower rung. Thus, the race among claimants is to reach the highest rung on the claims ladder.

*Bankruptcy Law > Liquidations > Estate Property Distribution > General Overview*
[HN14] In Chapter 7 cases, there is no presumed, or default, "rung" on the priority ladder; creditors are not automatically assigned to the general unsecured pool. Rather, each creditor must demonstrate its entitlement to distribution at a particular level. Otherwise, a claimant may be provided priority at a higher level than that to which it is entitled, watering down the dividend provided to creditors the legislation prefers. This would be contrary to the predominant goal of the Bankruptcy Code to secure equal distribution among similarly situated creditors.

*Bankruptcy Law > Claims > Objections*
*Bankruptcy Law > Liquidations > Estate Property Distribution > Distributions Among Unsecured Classes*
[HN15] Questions of a claim's statutory priority are properly raised as part of a claim objection. These questions must be distinguished from attempts at equitable subordination under *11 U.S.C.S. § 510*.

*Bankruptcy Law > Claims > Proof > Content, Evidence & Form*
[HN16] Proofs of claim may properly be accompanied by summaries, rather than voluminous records displaying every jot and tittle of account history. *Fed. R. Bankr. P. 3001(a)*; Official Form 10. A reasoned, case-by-case approach, taking into account detail provided, content of the schedules, the identity of the objector (e.g., trustee or debtor) is appropriate.

*Bankruptcy Law > Liquidations > Estate Property Distribution > Distributions Among Unsecured Classes*
[HN17] *11 U.S.C.S. § 726(a)*, while elevating certain unsecured claims over others for policy reasons, also assures that recompense for actual pecuniary loss is not diluted by including noncompensatory losses at an equal priority. *11 U.S.C.S. § 726(a)(4)*. Indeed, allowed, tardily filed claims for actual losses are paid before noncompensatory fines, penalties, forfeitures, and damages. *11 U.S.C.S. § 726(a)(3)*.

*Bankruptcy Law > Liquidations > Estate Property Distribution > General Overview*

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 6 of 33

Page 4

418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

[HN18] In bankruptcy courts, penalties are not in accordance with the goal of equity because they inevitably favor one creditor to the disadvantage of the other creditors.

*Bankruptcy Law > Practice & Proceedings > Appeals > General Overview*
*Civil Procedure > Appeals > Reviewability > Preservation for Review*
[HN19] Arguments made in a perfunctory manner below are deemed waived on appeal. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.

COUNSEL: William Andrew McNeal, Esq., on brief for Appellant, American Express Bank, FSB, and Cross-Appellee, eCast Settlement Corporation.

Michael S. Askenaizer, Esq., on brief for Appellee/Cross-Appellant.

JUDGES: Before Haines, Votolato, and de Jesus, United States Bankruptcy Appellate Panel Judges.

OPINION BY: Haines

OPINION

[*497] **Haines, U.S. Bankruptcy Appellate Panel Judge.**

American Express Bank, FSB, appeals from the bankruptcy court's order disallowing [*498] its general unsecured claim for $ 42,452.61 in credit card debt. Michael Askenaizer, the chapter 7 trustee, appeals the bankruptcy court's order allowing eCast Settlement Corporation's general unsecured claim, another credit card debt, in the amount of $ 6,309.75. The trustee also appeals the court's denial of his request for an award of attorney's fees pursuant to New Hampshire statute.

Although the combatants initially locked horns over *allowance* of the AmEx and eCast claims, the scope of the contest narrowed in the course of the appeal. At oral argument, the trustee acknowledged that the estate is *indebted* to [**2] each creditor, but he pressed his point that neither provided sufficient evidence to support payment as a general unsecured claim. As he had in the lower court, he argued that each creditor's claim comprised principal, interest, and other fees such that, without a detailed itemization of the basis and timing of their charges, the court could not determine the *priority* distribution their claims should be accorded.

In the end, we agree that the claims are not entitled to share as general unsecured claims [1] because both AmEx and eCast failed to prove their entitlement to the distributional status they sought. Accordingly, we **REVERSE** disallowance of AmEx's claim and **AFFIRM** allowance of eCast's claim, but do so with an accompanying determination that their allowed claims are entitled to no better treatment than the priority provided under § 726(a)(4). We also **AFFIRM** the disallowance of the trustee's request for a fee award.

[1]   The term "general unsecured claim" is nearly universally considered by bankruptcy courts and practitioners to mean an unsecured claim that will receive distribution from the estate via § 726(a)(2). We use the term intending that meaning throughout this opinion. As we [**3] employ it, the term does not include unsecured claims that receive more favored treatment under § 726(a)(1) (i.e., administrative claims) and those that receive less favored treatment under § 726(a)(3) (tardily filed claims), § 726(a)(4) (fines and penalties), and § 726(a)(5) (post-petition interest on allowed claims).

Unless otherwise noted, all references to statutory sections or to the "Bankruptcy Code" are to the Bankruptcy Reform Act of 1978, as amended prior to April 20, 2005, *11 U.S.C. §§ 101, et seq.* All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

JURISDICTION

Before addressing the merits, we must determine our jurisdiction. See *Boylan v. George E. Bumpus, Jr. Constr. Co. (In re George E. Bumpus, Jr. Constr. Co.), 226 B.R. 724 (B.A.P. 1st Cir. 1998)*. [HN1] We have jurisdiction to hear appeals from: (1) final judgments, orders, and decrees; or (2) with leave of court, from certain interlocutory orders. *28 U.S.C. § 158(a); Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.), 218 B.R. 643, 645 (B.A.P. 1st Cir. 1998)*. A decision is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the [**4] judgment," *id. at 646* (citations omitted), whereas an interlocutory order "only decides some intervening matter pertaining to the cause, and requires further steps to be taken in order to enable the court to adjudicate the cause on the merits." Id. (quoting *In re American Colonial Broad. Corp., 758 F.2d 794, 801 (1st Cir. 1985)*). The bankruptcy court's order allowing or disallowing a claim is final and, thus, appealable. See *Orsini Santos v. Lugo Mender (In re Orsini Santos), 349 B.R. 762, 768 (B.A.P. 1st Cir. 2006)* (citing *Perry v. First Citizens Fed. Credit Union (In re Perry), 391 F.3d 282, 285 (1st Cir.*

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 7 of 33

Page 5
418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

2004)). Similarly, the order denying the trustee's request for a fee award is final [*499] and appropriate for our review. See *General Elec. Capital Corp. v. Future Media Prods., 536 F.3d 969 (9th Cir. 2008);* see also *Xifaras v. Morad (In re Morad), 328 B.R. 264 (B.A.P. 1st Cir. 2005).*

## STANDARD OF REVIEW

[HN2] We review the bankruptcy court's findings of fact for clear error and conclusions of law *de novo.* See *T.I. Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995); Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.), 43 F.3d 714, 719-20 n.8 (1st Cir. 1994).* To [**5] resolve the issues on appeal, we must interpret and apply §§ 726 and 502, and *Bankruptcy Rule 3001.* Such interpretations are legal questions subject to *de novo* review. See *Caplan v. B-Line, LLC (In re Kirkland), 572 F.3d 838, 840 (10th Cir. 2009).* [2] Disposition of the trustee's request for a fee award was the result of a legal conclusion, as well. Thus, we review all the issues presented *de novo.*

> 2  The lesser included question whether AmEx's and eCast's proofs of claim established "prima facie evidence" of their validity is a question of law. And, although the bankruptcy court took evidence, its determination regarding the sufficiency of each creditor's evidence constitutes a legal conclusion, as well.

## BACKGROUND

### 1. The Case and Claims

Robert and Debra Plourde filed a voluntary chapter 7 petition in October 2005. Their schedules listed multiple credit card debts.

AmEx filed a proof of claim for an unsecured, non-priority claim in the amount of $ 42,452.61, designated Claim # 4 on the bankruptcy court's claims register. AmEx utilized Official Form 10, [3] and indicated, by failing to check a particular box in Part 4, that no "interest or other charges in addition to the principal" constituted [**6] a part of its claim. Attached to the form was one page from a credit card account statement dated October 14, 2005, issued to "Debra A. Plourde and Elect. Contr/Assoc." The statement showed a $ 42,452.61 balance and indicated that the account was "cancelled and suspended." Although the Plourdes listed two unsecured, nonpriority debts to AmEx in Schedule F, neither corresponded with the debt set out in Claim # 4.

> 3  In filing their proofs of claim, AmEx and eCast used a version of Official Form 10, as revised in September 1997. Form 10 was subse-

quently further revised, most recently in December 2008.

Also employing Official Form 10, [4] eCast filed its proof for an unsecured, nonpriority claim in the amount of $ 6,813.06, designated Claim # 18 on the bankruptcy court's claims register. In the same manner as AmEx, eCast indicated its claim consisted of principal only (i.e., no "interest or other charges"). Attached to the claim form was a single-page computer-generated document entitled "Account Summary." It identified Robert Plourde as the debtor, and set out the bankruptcy case number, the filing date, the last four digits of an account number, and a listing of statement balances for June [**7] 9, 2005 through November 9, 2005. The Plourdes scheduled no debts to eCast, but did schedule an unsecured obligation in the amount of $ 6,309.75 to "The GM Card," bearing the same account number eCast had listed for Claim # 18.

> 4  See note 3, supra.

### 2. The Claims Objections

The trustee insisted that AmEx and eCast be put to their proof. AmEx's Claim # 4 was deficient in his view because: [*500] (1) the obligation had not been listed on the Plourdes' schedules and the proof of claim's accompanying documentation was insufficient to establish their liability; and (2) because the claim appeared to be a credit card obligation, it likely included interest and other charges not reflected on the claim form or itemized separately. Thus, he asserted that Claim # 4 did not conform with the requirements of *Bankruptcy Rule 3001(a)* and *(c),* and, therefore, was not entitled to a presumption of validity under *Bankruptcy Rule 3001(f).*

With respect to Claim # 18, the trustee stated that: (1) although the Plourdes' schedules listed a debt to The GM Card with an account number that matched the account number listed by eCast, the claim amount in the schedules was less than the amount set forth in Claim # 18; and (2) [**8] although Claim # 18 seemed to include interest and other charges, eCast's proof of claim form did not acknowledge them or itemize them. As a result, he argued that Claim # 18 did not conform with the requirements of *Bankruptcy Rule 3001(a)* and *(c),* and was not entitled to the presumption of validity under *Bankruptcy Rule 3001(f).*

Shortly thereafter, the creditors' counsel provided documentation intended to address the trustee's objections. [5] With respect to Claim # 4, he provided: (1) credit card account statements issued to "Debra A. Plourde and Elect. Contr/Assoc." for October 2004 through June 2005; and (2) a document that purported to be the credit card agreement between AmEx and Mrs. Plourde. With

418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

respect to eCast's Claim # 18, he provided credit card account statements for December 2004 through July 2005. [6] eCast also filed another proof of claim, designated Claim # 28, which amended Claim # 18, reducing the sum from $ 6,813.06 to $ 6,778.06. The reduced amount remained greater than the GM Card debt scheduled by the Plourdes. Attached to Claim # 28 were six monthly credit card account statements (February 2005 through July 2005).

> 5   AmEx and eCast were represented by the same attorney [**9] below, as they are on appeal.
> 6   The documents themselves are not contained in either the appendix or the appellate record as designated by the parties.

After an initial hearing, AmEx and eCast filed a formal response to the trustee's objections, arguing, *inter alia*, that itemized statements (relating to interest and other charges, as required by Official Form 10) were not necessary because:

> For an unsecured revolving debt instrument such as a credit card account, the filing of bankruptcy effectively cancels the account. The accumulation of interest and other charges on the account also cease as of the petition date for any account that is open and active on the petition. A claim filed for a credit card account, therefore, represents a "snapshot" of the account as of the filing of the Debtor's petition. The claim amount is the outstanding balance on the Debtor's account on the petition date. There is no unmatured interest. By any practical characterization, the balance owed on the petition date is all principal. It is not subject to separate interest, fee, and principal components such as would be the case with a secured claim.

Response of American Express Bank and eCast Settlement Corporation [**10] to Trustee's Objections to Claim Numbers 4 and 18.

In turn, the trustee argued that the AmEx and eCast proofs of claim were "misleading and incomplete"; that, despite his requests, each had failed to itemize the [*501] interest and other charges contained within their claims. He asserted that, although AmEx and eCast had produced a few monthly statements, those did not enable him to determine the accuracy of the claims and, as a result, the claims should be disallowed under § 502(b).

He also urged that the creditors must provide itemized statements so that he could identify whether any components of their claims should, pursuant to § 726(a)(4), receive distributions only after payment of general unsecured claims. [7]

> 7   [HN3] *Section 726(a)(4)* subordinates allowed claims "for any fine, penalty, or forfeiture, or for malice, exemplary, or punitive damages" to the extent they "are not compensation for actual pecuniary loss."

Finally, the trustee sought an award of attorney's fees pursuant to New Hampshire state law, *N.H. Rev. Stat. Ann. § 361-C:2*, if the bankruptcy court concluded that he was the prevailing party on his objections to the AmEx and eCast claims.

The bankruptcy court ultimately convened [**11] a final hearing, accepted briefs and took the matter under submission.

### 3. The Decision Below.

The bankruptcy court sustained the trustee's objection as to AmEx's claim, disallowing it entirely. It allowed eCast's claim for $ 6,309.75, the amount the Plourdes had scheduled as The GM Card debt, but less than eCast had sought.

In its lengthy decision, the bankruptcy court concluded that Claim # 4 did not establish the prima facie validity of AmEx's claim because it did not include the *applicable* credit card agreement or any evidence itemizing the charges included in the claim. Although AmEx provided a copy of the original credit card agreement, the court noted that the agreement's terms were not fixed. There was no way to ascertain whether, during the life of the agreement, AmEx may have exercised its unilateral right to impose additional or different terms. [8] Consequently, the bankruptcy court concluded that "in the absence of any evidence of the contractual charges that constitute AmEx's [Claim # 4], this Court can make no finding that any of those charges are either allowable under § 502 or entitled to second priority distribution under § 726(a)(2)."

> 8   The bankruptcy court stated:
>
> > After [**12] all, regardless of the provisions of the credit card agreement, the card issuer may have exercised its right under the agreement to impose additional or different terms. Under the terms of the typical credit card agreement, including the AmEx agreement in this case, the terms that exist be-

418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

tween the issuer and the consumer at any particular time may only be determined if a listing or historical summary of charges and interest is provided. The agreement itself is at best only evidence of the existence of a contractual relationship, but is little or no evidence of the terms of the contract from time to time. The need to provide details on the terms and conditions of the contract, and the actual charges and interest imposed, from time to time may be onerous from the credit card issuer's [sic] point of view. However, such difficulties flow from the business model that the credit card industry has voluntarily adopted. So long as credit card issuers wish to maintain sole discretion to vary the terms of their agreement with a consumer at any time, and from time to time, they must accept the legal consequences of that business model. One of those consequences is that they may need to provide [**13] details of the charges and interest imposed by them in response to a proper objection to a proof of claim in a bankruptcy proceeding.

See *In re Plourde, 397 B.R. 207, 226 (Bankr. D.N.H. 2008)*.

The court allowed eCast's claim as a general unsecured claim in the amount the Plourdes scheduled for The GM Card, $ 6,309.75. It observed that the Plourdes had acknowledged the debt by scheduling [*502] it (as undisputed) and, therefore, their schedules, combined with the information submitted by eCast, provided "limited but sufficient evidence to establish the nature and amount of its claim absent a substantive objection by the Trustee." The court concluded, however, that eCast had failed to submit any evidence to support its claim in an amount beyond that scheduled by the Plourdes.

Finally, the bankruptcy court denied the trustee's request for an award of attorney's fees, which he had sought under *N.H. Rev. Stat. Ann. § 361-C:2*, a statute imposing reciprocal responsibility when a credit card agreement purports to impose responsibility for fees on a debtor when the creditor successfully enforces it. [9] Although the trustee had been partially successful in his objection to eCast's claim, nothing in the [**14] record

satisfied the statute's principal condition - that the underlying agreement provided for the creditor to recover attorney's fees in an action against the debtors. As to AmEx, the court determined that, although the credit card agreement did provide for AmEx to recover attorney's fees, it was expressly governed by Utah law, not New Hampshire law, and the trustee failed to prove the content of Utah law or, alternatively that New Hampshire law should override the agreement's terms. See *Plourde, 397 B.R. at 227*.

9   The statute, which governs the collection of attorney's fees in consumer cases, provides:

[HN4] If a retail installment contract or evidence of indebtedness provides for attorney's fees to be awarded to the retail seller, lender or creditor in any action, suit or proceeding against the retail buyer, borrower or debtor involving the sale, loan or extension of credit, such contract or evidence of indebtedness shall also provide:

I. Reasonable attorney's fees shall be awarded to the buyer, borrower or debtor if he prevails in

(a) Any action, suit or proceeding brought by the retail seller, lender or creditor; or

(b) An action brought by the buyer, borrower or debtor; and

II. If a buyer, [**15] borrower or debtor successfully asserts a partial defense or set-off, recoupment or counterclaim to an action brought by the retail seller, lender or creditor, the court may withhold from the retail seller, lender or creditor the entire amount or such portion of the attorney fees as the court considers equitable.

418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

*N.H. Rev. Stat. Ann. § 361-C:2.*

On appeal, AmEx challenges its claim's disallowance, while the trustee challenges allowance of eCast's claim and the denial of his request for attorney's fees.

## DISCUSSION

### I. Filing and Allowance of Claims

#### A. Sections 501 and 502 and *Bankruptcy Rule 3001* - Claims Allowance

[HN5] *Sections 501* and *502* govern the filing and allowance of creditor claims in bankruptcy proceedings. See *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co., 549 U.S. 443, 127 S. Ct. 1199, 167 L. Ed. 2d 178 (2007).* When a debtor files for relief, each creditor is entitled to file a proof of claim against the debtor's estate pursuant to *§ 501.* Once a creditor has filed such a proof, the bankruptcy court must determine whether the claim is "allowed." [10] *Section 502(a)* provides that a proof of claim filed under *§ 501* is deemed allowed unless a party in interest (often   [*503]   the trustee) objects. However, even where   [**16] a party in interest objects, the court "shall allow" the claim unless one of nine exceptions enumerated in *§ 502(b)* applies. [11]

> 10    "Allowance" constitutes determination of the amount of a "claim" (see *§ 101(5))* "in lawful currency of the United States as of the date of the filing of the petition" except to the extent that it is unenforceable as a matter of law (generally speaking, contract law) or unless its enforceablity against the estate is limited for reasons related to bankruptcy policies such as equalizing treatment among creditors or avoiding overreaching by insiders of the debtor. See *11 U.S.C. § 502(b).*
>
> 11    *Section 502(b)* provides:

> > [HN6] Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
> >
> > > (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;
> > >
> > > (2) such claim   [**17] is for unmatured interest;
> > >
> > > (3) if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;
> > >
> > > (4) if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services;
> > >
> > > (5) such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title;
> > >
> > > (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
> > >
> > > > (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the re-

418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

maining term of such lease, following the earlier of--

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds--

(A) the compensation provided [**18] by such contract, without acceleration, for one year following the earlier of--

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates;

(8) such claim results from a reduction, due to late payment, in the amount of an otherwise applicable credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor; or

(9) proof of such claim is not timely filed, except to the extent tardily filed as permitted under paragraph (1), (2), or (3) of *section 726(a)* of this title or under the Federal Rules of Bankruptcy Procedure, except that a claim of a governmental unit shall be timely filed if it is filed before 180 days after the date of the order for relief or such later time as the Federal Rules of Bankruptcy Procedure may provide, and except that in a case under chapter 13, a claim of a governmental unit for a tax with respect to a return filed under *section 1308* shall be timely if the claim is filed on or [**19] before the date that is 60 days after the date on which such return was filed as required.

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 12 of 33

Page 10

418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

[HN7] The Bankruptcy Code itself does not prescribe what documentation, if any, must accompany a proof of claim. However, the Federal Rules of Bankruptcy Procedure, which provide the procedural framework for the filing and allowance of claims, regulate the form, content, and attachments for proofs of claim. *Bankruptcy Rule 3001(a)* requires that a proof of claim be a written statement that conforms substantially with "the appropriate Official Form," which is Official Form 10. *Bankruptcy Rule 3001(c)* directs creditors filing a proof of claim "based on a writing" to attach either the original or a duplicate of the writing.

Official Form 10 instructs the claimant to "attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running [*504] accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of liens." Official Form 10. The creditor is required to explain any failure to attach documents based on a lack of availability. In addition, if the required documents are too voluminous, the creditor may attach a summary. Official [**20] Form 10 further requires the claimant to specify whether the claim includes "any interest or other charges in addition to the principal amount of the claim," and if so, to attach an "itemized statement of all interest or additional charges."

[HN8] *Bankruptcy Rule 3001(f)* sets the evidentiary effect of a properly filed proof of claim (i.e., one that complies with the requirements of the rule and form), stating that a claim "filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." *Fed. R. Bankr. P. 3001(f)*; see also *In re Long, 353 B.R. 1, 13 (Bankr. D. Mass. 2006)* (citing *Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.), 993 F.2d 915, 925 (1st Cir. 1993)*).

In order to rebut the prima facie evidence a proper proof of claim provides, the objecting party must produce "substantial evidence" in opposition to it. See *In re Long, 353 B.R. at 13*; see also *United States v. Clifford (In re Clifford), 255 B.R. 258, 262 (D. Mass. 2000)*. If the objection is substantial, the claimant "is required to come forward with evidence to support its claims . . . and bears the burden of proving its claims by a preponderance of the evidence." *Tracey v. United States (In re Tracey), 394 B.R. 635, 639 (B.A.P. 1st Cir. 2008)* [**21] (citing *In re Organogenesis, Inc., 316 B.R. 574, 583 (Bankr. D. Mass. 2004)*). [12]

> 12   [HN9] *Section 502* lists nine bases for disallowing claims. Failure to file a proof of claim meeting the requirements of *Bankruptcy Rule 3001* and Official Form 10 is not among them.

See *11 U.S.C.§ 502(b)*, supra n.11. Neither *Bankruptcy Rule 3001* nor *§ 502* provides that a proof of claim which does not conform with the requirements of the rule and/or the form be disallowed due to such noncompliance, nor do they otherwise address the consequence of filing a proof of claim that fails to meet all of the rule's requirements. Rather, when the proof of claim is not filed in accordance with the Federal Rules of Bankruptcy Procedure, it does not constitute prima facie evidence of the validity and amount of the claim, and the burden of proof rests on the claimant. *In re Long, 353 B.R. at 13*. *Bankruptcy Rule 3001* and Official Form 10's documentary requirements and the shifting burden serve two purposes. See *In re Burkett, 329 B.R. 820, 827 (Bankr. S.D. Ohio 2005)*. First, the supporting documentation required by the rule and form are intended to enable the debtor or trustee to evaluate the claim's amount and validity and [**22] to challenge portions of the claim that may be inaccurate. Id. Second, the rules governing claims are intended to simplify the claims allowance process and provide a fair and inexpensive process for all parties including creditors. Id.

Courts differ as to whether *§ 502(b)* sets forth the *exclusive* bases upon which a claim may be disallowed, or whether a court may disallow a claim for reasons other than those listed in that subparagraph. Compare *Heath v. American Express Travel Related Servs. Co., Inc. (In re Heath), 331 B.R. 424 (B.A.P. 9th Cir. 2005)*; *Dove-Nation v. eCast Settlement Corp. (In re Dove-Nation), 318 B.R. 147 (B.A.P. 8th Cir. 2004)*; *In re Moreno, 341 B.R. 813 (Bankr. S.D. Fla. 2006)*; *In re Burkett, 329 B.R. at 828-29*; *In re Shaffner, 320 B.R. 870 (Bankr. W.D. Mich. 2005)*; *In re Mazzoni, 318 B.R. 576 (Bankr. D. Kan. 2004)*; *In re Shank, 315 B.R. 799 (Bankr. N.D. Ga. 2004)*; *In re Kemmer, 315 B.R. 706 (Bankr. E.D. Tenn. 2004)*; *In re Cluff, 313 B.R. 323 (Bankr. D. Utah 2004)*, aff'd, *2006 U.S. Dist. LEXIS 71904, 2006 WL 2820005 (D. Utah Sept. 29, 2006)*; with *In re Stoecker, 5 F.3d 1022 (7th Cir. 1993)* (adopting nonexclusive view); *eCast Settlement Corp. v. Tran (In re Tran), 369 B.R. 312 (S.D. Tex. 2007)*; [**23] *In re Taylor, 363 B.R. 303 (Bankr. M.D. Fla. 2007)*; *In re Armstrong, 320 B.R. 97 (Bankr. N.D. Tex. 2005)*; *In re Henry, 311 B.R. 8/13 (Bankr. W.D. Wash. 2004)*; *In re Jorczak, 314 B.R. 474 (Bankr. D. Conn. 2004)*. We note these divergent views here, although, because *allowance* of the claims is no longer the issue in this appeal, we need not choose sides.

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 13 of 33

Page 11
418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

[*505] Were we to determine this appeal based on issues pertaining solely to the *allowance* of the AmEx and eCast claims, the questions would be close. On the one hand, AmEx produced its original agreement with Mrs. Plourde, although the terms of the agreement as they existed through the life of the credit relationship remained in doubt. The AmEx agreement vested in AmEx the right to amend its terms at will. Thus, as the bankruptcy judge concluded, one could not be sure exactly for what AmEx charged the account without a far more careful and comprehensive itemization than AmEx chose to provide. For the bankruptcy judge, those failings were enough to order the claim's disallowance. But we wonder whether, putting questions about priority to the side, one could conclude as a matter of law that AmEx had not proved estate liability on its claim. After [**24] all, it did produce the credit agreement and a series of statements showing the balances owed.

eCast, on the other hand, produced no agreement, but relied upon the Plourdes' scheduling of the identical-ly-numbered GM Card debt, with a balance approximating the amount of eCast's proof of claim. For the bankruptcy judge, that was sufficient proof to allow eCast's claim, granting the schedule evidentiary weight notwithstanding its hearsay character as to the trustee. [13] He credited the Plourdes' schedule and considered it evidence supporting liability as a hearsay statement imbued with sufficient indicia of reliability to be admissible under the federal evidence rules' residuary exception to the hearsay rule. [14] The correctness of that conclusion, however, rests on the exception's applicability, which is questionable. One of the rule's requirements is that the hearsay statement "is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts . . . ." Can it really be said that a statement in the debtors' schedules is "more probative" on the question of liability on the account than the creditor's own records? That [**25] the creditor cannot be expected to procure and proffer its own records to support its claim? [15]

13   Generally, a bankruptcy court may properly consider a debtor's petition, schedules and statement of affairs as evidentiary admissions made by the debtor. See *Fed. R. Evid. 801(d)(2)* (providing that a statement is not hearsay if "the statement is offered against a party and is . . . the party's own statement . . ."). Therefore, a debtor's schedules may be admissible as nonhearsay evidence to establish the validity and ownership of a claim against a debtor when the debtor is the party objecting to the claim. See *Torgenrud v. Wolcott (In re Wolcott), 194 B.R. 477, 483 (Bankr. D. Mont. 1996)*; see also *In re Bohrer, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001)*

("Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions."). However, when the objecting party is the trustee, the bankruptcy schedules are not admissible as an admission against the trustee. See *Kirkland, 572 F.3d at 840-41* (stating that debtor's schedules "were of no evidentiary value against the Trustee"); *Burkett, 329 B.R. at 829* ("Of [**26] course, a debtor's scheduling of a debt does not constitute an admission by the trustee . . . ."); *Jorczak, 314 B.R. at 482-83* (scheduling of a debt constitutes an admission which is binding upon the debtors but not the trustee).

14   See *Fed. R. Evid. 807.*

15   At least one court of appeals has held that the statements in the debtors' schedules are of "no evidentiary value" against a bankruptcy trustee contesting allowance of a creditor's claim. See *Kirkland, 572 F.3d at 840-41.*

But we need not resolve those issues. The trustee concedes that the Plourdes' bankruptcy estate is liable on both claims. [*506] Thus, both may now be considered "allowed." The trustee has, however, continued his insistence that, in light of their failures of proof, neither AmEx nor eCast had established its entitlement to be paid as a general unsecured claim.

## B. Distributional Priorities - § 726

[HN10] Under § 502(b), "allowance" of a claim constitutes a determination of "the *amount* of such claim". [16] As has been the case here, parties often conflate a claim's allowance with establishing its distributional entitlement. This is understandable. In most cases, the question simply is whether - and how much - a claimant is owed by a debtor [**27] (and thus the estate). When a claim is asserted to be a general unsecured claim, issues about its entitlement to that priority in the bankruptcy distributional scheme do not often arise.

16   See *11 U.S.C. § 502(b)*, supra n.11.

But a claim's allowance merely establishes it as a charge against the estate. Its distributional priority is separately addressed by § 726(a). [17] In each instance (including the cross-reference to § 507 administrative claims in § 726(a)(1)), the priorities set by § 726(a) dictate the order in which *allowed* unsecured claims are to be paid. A claim's allowance stands for little in terms of actually getting paid if, in the course, the claimant has not also established its claim's § 726(a) priority. [18]

17   *Section 726(a) provides:*

[HN11] Except as provided in *section 510* of this title, property of the estate shall be distributed -

(1) first, in payment of claims of the kind specified in, and in the order specified in, section

507 of this title, proof of which is timely filed under section 501 of this title or tardily filed on or before the earlier of -

(A) the date that is 10 days after the mailing to creditors of the summary of the trustee's final report; or

(B) the date on which [**28] the trustee commences final distribution under this section;

(2) second, in payment of any *allowed* unsecured claim, other than a claim of a kind specified in paragraph (1), (2), (3), or (4) of this subsection, proof of which is -

(A) timely filed under section 501(a) of this title;

(B) timely filed under section 501(b) or 501(c) of this title; or

(C) tardily filed under section 501(a) of this title, if -

(i) the creditor that holds such claim did not have notice or actual knowledge of the case in time for timely filing of a proof of such claim under section 501(a) of this title; and

(ii) proof of such claim is filed in time to permit payment of such claim;

(3) third, in payment of any *allowed* unsecured claim proof of which is tardily filed under section 501(a) of this title other than a claim of the kind specified in paragraph (2)(C) of this subsection;

(4) fourth, in payment of any *allowed* claim, whether secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary [**29] loss suffered by the holder of such claim;

(5) fifth, in payment of an interest at the legal rate from the date of the filing of the

Case 1:09-cv-02973-CMA Document 11-1 Filed 03/03/10 USDC Colorado Page 15 of 33

Page 13

418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection; and

(6) sixth, to the debtor.

*11 U.S.C. § 726(a).*

18 Payment priority is critical in chapter 7 cases. We know that few of these liquidation proceedings produce *any* distributions to creditors. And, for those that do, it is seldom the case that all general unsecured claimants are fully paid. Thus, practically speaking, relegation to subordinated status means receiving no distribution from the estate in most cases. See *United States v. Waindel (In re Waindel), 65 F.3d 1307, 1309-1310 (5th Cir. 1995)* ("*Section 726* sets forth the order for payment of claims. The general scheme requires payment of priority claims followed by unsecured claims and, if any money remains, payment of late claims, various types of penalties and interest. There will hardly ever be surplus funds available to the estate after payments to the first two tiers of creditors in a Chapter 7 case . . . ."); see also U.S. Trustee Program, Preliminary Report on Chapter 7 Asset Cases 1994 to 2000 (June 2001), *available* [**30] *at* http://www.usdoj.gov/ust/eo/public_affairs/statist ics/stats_reports.htm ("Historically, the vast majority (about 95 to 97 percent) of chapter 7 cases yield no assets." Of the remaining chapter 7 cases closed between 1994 and 2000, 54.6 percent had receipts of less than $ 5,000); Jimenez, Dalie, The Distribution of Assets in Consumer Chapter 7 Bankruptcy Cases (September 10, 2009), *available at* SRRN: http://ssrn.com/abstract=1471603 (finding that of 2,500 consumer chapter 7 cases examined in the year 2007, only seven percent had assets available for distribution to unsecured creditors).

[*507] For example, [HN12] an unsecured creditor seeking administrative claim treatment within *§ 726(a)(1)* (ahead of the general pool of unsecured creditors) has the burden of proving the elements that qualify it for that status. See, e.g., *McMillan v. LTV Steel, Inc., 555 F.3d 218, 226 (6th Cir. 2009)*; *Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), 479 F.3d 167, 172 (2d Cir. 2007)*; *Isaac v. Temex Energy, Inc. (In re Amarex, Inc.), 853 F.2d 1526, 1530 (10th Cir. 1988)*; In

*re Franklin, 284 B.R. 739, 742 (Bankr. D.N.M. 2002)*; *In re Philadelphia Mortg. Trust, 117 B.R. 820, 827 (Bankr. E.D. Pa. 1990)*; [**31] see also *Woburn Assocs. v. Kahn (In re Hemingway Transport, Inc.), 954 F.2d 1 (1st Cir. 1992)*; *In re Beyond Words Corp.,193 B.R. 540, 543 (N.D. Cal. 1996).*

[HN13] A party in interest may object to a claimant's right to be paid as a general unsecured claim. In such instances, when a substantial objection to the claimed priority is interposed, the claimant shoulders the burden of proving its entitlement to payment under *§ 726(a)(2)*. Once a claim is deemed allowed, its priority must be determined.

> In most Chapter 7 cases, like this one, a claim holder's "rung" on the priority "ladder" created under *section 726* is crucial because the estate assets are limited. There are usually insufficient assets to pay all claimants in full, and *section 726(b)* mandates pro rata distribution among all claimants at each level, or rung of the priority ladder, with an absolute priority cutoff. All allowed claimants at a particular level or rung of the ladder must be paid in full before any estate claims can be distributed to holders of claims at the next lower rung. Thus, the race among claimants is to reach the highest rung on the claims ladder.

*In re Stoecker, 151 B.R. 989, 995 (Bankr. N.D. Ill. 1992)*, rev'd on other [**32] grounds, *179 B.R. 532 (N.D. Ill. 1994).*

[HN14] There is no presumed, or "default," "rung" on the priority ladder; creditors are not automatically assigned to the "general unsecured" pool. Rather, each creditor must demonstrate its entitlement to distribution at a particular level. See *Amarex, 853 F.2d at 1530* ("[T]he burden of proving entitlement to a priority is on the person claiming priority."). Otherwise, a claimant may be provided priority at a higher level than that to which it is entitled, watering down the dividend provided to creditors the legislation prefers. This would be contrary to the predominant goal of the Bankruptcy Code "to secure equal distribution among [similarly situated] creditors." See *Howard Delivery Serv. v. Zurich Am. Ins. Co., 547 U.S. 651, 655, 126 S. Ct. 2105, 165 L. Ed. 2d 110 (2006)*; *Bethlehem Steel Corp., 479 F.3d at 172* ("Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed.").

418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

[*508] [HN15] Thus, questions of a claim's *statutory* priority are properly raised as part of a claim objection. These questions must be distinguished from attempts at equitable subordination under *§ 510*. [19] We acknowledge [**33] *§ 510* here only to be clear that we are not proceeding under that section (where different procedures and burdens apply), but rather under the explicit statutory priority-setting provisions of *§ 726*.

> 19   *Section 510(c)(1) of the Bankruptcy Code* explicitly allows bankruptcy courts to reorder existing priorities among creditors "under principles of equitable subordination."

> > Bankruptcy courts do indeed have some equitable powers to adjust rights between creditors. See, e.g., *§ 510(c)* (equitable subordination). That is, within the limits of the Code, courts may reorder distributions from the bankruptcy estate, in whole or in part, for the sake of treating legitimate claimants to the estate equitably. But the scope of a bankruptcy court's equitable power must be understood in the light of the principle of bankruptcy law discussed already, that the validity of a claim is generally a function of underlying substantive law. Bankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, but are limited to what the Bankruptcy Code itself provides. See *United States v. Reorganized CF&I Fabricators of Utah, Inc., 518 U.S. 213, 228-229, 135 L. Ed. 2d 506, 116 S. Ct. 2106 (1996)*; [**34] *United States v. Noland, 517 U.S. 535, 543, 134 L. Ed. 2d 748, 116 S. Ct. 1524 (1996).*

> *Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 24, 120 S. Ct. 1951, 147 L. Ed. 2d 13 (2000).*

Having limned the contours of claims allowance and priority with respect to substance and process, we now turn to the remaining disputes.

## C. The AmEx and eCast Claims

### 1. Sufficiency of the Proofs of Claim

That neither AmEx's nor eCast's proof of claim was entitled to be treated as *prima facie* evidence of a valid claim could not be plainer. To begin, neither noted on the form that its claim included "interest or other charges." That representation was untrue and the trustee properly took exception to it. [20]

> 20   The trustee's objection to the AmEx proof of claim stated, *inter alia*, "In addition, it is possible, and no doubt likely, that the claim includes interest and other charges that are not reflected on the statement attached to the proof of claim, despite the fact that section 4 of the proof of claim requires that the claimant, if it is seeking interest and other charges in addition to the principal, to so indicate and to attach an itemized statement of all interest or additional charges." As [**35] to eCast's claim, the trustee objected in similar terms.

> The objection was sufficiently substantial to overcome the possibility that the proofs of claim would be given *prima facie* evidence of the claims' validity as general unsecured claims. Unless one accepts the silly sidestep suggested by AmEx and eCast, it is virtually inconceivable that a credit card claim would not include interest and "other charges." "There are two kinds of creature in the jungle: the tiger and the iguana. The tiger sets the fees, and the iguana pays them." Mark Halperin, Memoir from Antproof Case at 463 (Harcourt Brace & Co. 1995). Credit card issuers are the tigers of consumer finance. See Testimony of Elizabeth Warren, Leo Gottlieb Professor of Law, Harvard Law School, before the U.S. Senate Committee on Banking, Housing, and Urban Affairs hearings "Examining the Billing, Marketing, and Disclosure Practices of the Credit Card Industry, and Their Impact on Consumers" (January 25, 2007); see also Johnson M. Tyler, "Exempt Income Protection Act Better Protects Strapped Debtors," N.Y. Law Journal, Jan. 27, 2009, at 4; U.S. General Accounting Office, "Credit Cards: Increased Complexity in Rates and Fees Heightens [**36] Need for More Effective Disclosure to Consumers" (GAO 06-929) (October, 2006); Tamara Draut, "The Plastic Safety Net, the Reality Behind Debt in America" (2005) (report released by public policy groups, Demos and the Center for Responsible Lending, discussing the truth behind the credit card debt explosion in the United States); Mitchell Pacelle, "Growing Profit Source for Banks: Fees From Riskiest Card Holders," Wall St. J., July 6, 2004 at A1 (report-

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 17 of 33

Page 15

418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

ing that credit card fees in 2003 rose to 33.4 percent of total credit card revenue, and that the credit card industry reaped $ 11.7 billion from penalty fees).

[*509] The creditors' defense to the trustee's objection on this score belies their denial that interest and other charges made up part of their claim. They assert that, because interest and other assessments cease when a credit card account is "canceled" on the bankruptcy filing, and as the amount claimed on the proof is the sum total of all that is owed on the petition date, the only "practical characterization" of what is claimed must be that it is entirely "principal."

The defects in the creditors' logic are manifest. Their claims are not composed purely of principal just because they [**37] say so. [21] The trustee is entitled to know what charges were assessed and the contractual basis for each charge. These creditors not only denied that interest or other charges were included in their claims, they failed to provide itemizations sufficient for the trustee to ascertain the bases for the claims or the effective terms of the credit agreements in force at the time the accounts were debited. [22]

> 21  "If you call a tail a leg, how many legs does a dog have? Four. Calling a tail a leg does not make it a leg." Abraham Lincoln, quoted in *United States v. Bowen, 527 F.3d 1065, 1077 n.9 (10th Cir. 2008)*.
>
> 22  [HN16] We recognize that proofs of claim may properly be accompanied by summaries, rather than voluminous records displaying every jot and tittle of account history. See *Fed. R. Bankr. P. 3001(a)* (providing that proof of claim shall conform substantially with appropriate Official Form); Official Form 10 (directing claimant to attach documents to support the claim or, if voluminous, a summary of such documents); see also *Dove-Nation, 318 B.R. at 151* (concluding that claimant complied substantially with rules by identifying the claims, attaching summaries of claims, providing explanations [**38] why additional documentation was not attached, and providing instructions to request additional documentation if desired); *In re Cluff, 2006 U.S. Dist. LEXIS 71904, 2006 WL 2820005, *12-13 (D. Utah Sept. 29, 2006)* (concluding that bankruptcy court did not err in declining to disallowed unsecured claims solely for insufficiency of attached documentation); *In re Heath, 331 B.R. at 432*. A reasoned, case-by-case approach, taking into account detail provided, content of the schedules, the identity of the objector (e.g., trustee or debtor) is appropriate.

The components of a claim can be critical. Examining a claim in light of interest and fees added to the account prepetition may have a lot to say about all or part of the claim's allowance (say, should consumer protection laws be implicated). In addition, by assigning lower priority to claims to the extent they include fines, penalties, forfeitures, or damages that are not compensation for "actual, pecuniary loss," the Code promotes equal treatment for creditors, aiming to distribute funds in respect to actual losses, before channeling them to pure penalties. [23]

> 23  [HN17] *Section 726(a)*, while elevating certain unsecured claims over others for policy reasons, see *§ 726(a)(1)*, [**39] also assures that recompense for actual pecuniary loss is not diluted by including noncompensatory "losses" at an equal priority. See *§ 726(a)(4)*. Indeed, allowed, tardily filed claims for actual losses are paid before noncompensatory fines, penalties, forfeitures, and damages. See *§ 726(a)(3)*.

Citing *Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996)*, AmEx and eCast contend that they were not required to identify the prepetition interest and other charges that contributed to their claim because such charges can never be relegated to the subordinated priority of *§ 726(a)(4)*. To begin, Smiley addressed the enforceability of late charges imposed by a credit card issuer against its customer. Although the Court held that, in accordance with interpretations announced [*510] by the Comptroller of Currency pursuant to the National Bank Act, the late charges constituted "interest" and were enforceable, it did not address bankruptcy priorities and limited its holding to fees imposed as commercial compensation, rather than penalties. *Id. at 746-47*. Moreover, Smiley addressed enforceability of a contractual late charge provision in a bilateral dispute between creditor and debtor, ignoring the [**40] implications of bankruptcy - a collective proceeding aimed at providing similarly situated creditors fair, *pro rata* distributions from a bankruptcy estate. [HN18] "In bankruptcy courts, penalties are not in accordance with the goal of equity because they inevitably favor one creditor to the disadvantage of the other creditors." *In re Rally Partners, L.P., 306 B.R. 165, 170 (Bankr. E.D. Tex. 2003)*. [24]

> 24  Contractually based charges have been determined to be penalties or forfeitures. Sometimes this results in their nonenforceability, and, thus, disallowance. *11 U.S.C. § 502(b)(1)*; see, e.g., *In re Leatherland Corp., 302 B.R. 250, 264 (Bankr. N.D. Ohio 2003)* (concluding that "success fee" was in nature of unenforceable penalty and not allowable); *In re Shepherds Hill Dev. Co., LLC*,

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 18 of 33

Page 16

418 B.R. 495, *; 2009 Bankr. LEXIS 3136, **;
62 Collier Bankr. Cas. 2d (MB) 877

*2000 Bankr. LEXIS 1807, 2000 WL 33679427 (Bankr. D.N.H. Jun. 6, 2000)*; *In re Rally Partners, 306 B.R. at 170*; *In re Timberline Prop. Dev., Inc., 136 B.R. 382, 386-87 (Bankr. D.N.J. 1992)*; *In re Jordan, 91 B.R. 673 (Bankr. E.D. Pa. 1988)*; *In re White, 88 B.R. 498 (Bankr. D. Mass. 1988)*. Sometimes, though enforceable, such claims are relegated to *§ 726(a)(4)* status. See *Crawford v. Ajax Enterp., LLC (In re Pheasant Cove, LLC), 2008 Bankr. LEXIS 393 (Bankr. D. Idaho Jan. 18, 2008)*; [**41] *Fundex Cap. Corp. v. Reichard (In re Tampa Chain Co., Inc.), 53 B.R. 772, 781-82 (Bankr. S.D.N.Y. 1985)*; 4 Norton Bankr. Law and Practice 3d, §§ 83:2 n.7 and 85:6 (noting that the former provision, *§ 57j* of the Bankruptcy Act, disallowed any penalty-type debts, but under *§ 726(a)(4)*, penalty-type debts are subordinated, but not disallowed).

## 2. The Failures of Proof

Faced with the trustee's objections to their claims, and his insistence that the creditors provide sufficiently detailed account summaries so that he could ascertain the nature, amount, and timing of, as well as the contractual bases for, the interest and other charges bound up in their claims, AmEx and eCast simply stonewalled. By refusing to provide or introduce evidence that established the nature of such charges, they failed to sustain their burden of demonstrating their claims (now their allowed claims) should be entitled, in their full amounts, to share in the estate as general unsecured claims. At the same time, neither creditor has provided the information necessary to discern what parts, if any, of their claims should be accorded general unsecured status under *§ 726(a)(2)* and what parts might be provided lower priority [**42] under *§ 727(a)(4)*.

Under the circumstances, we conclude that, although allowed, the AmEx and eCast claims must be paid (entirely) only to the extent funds are available for distribution to *§ 726(a)(4)* priority creditors. The consequences of their failures of proof must be visited on them alone, rather than on the estate's creditor constituents generally. Cf. *McMillan, 555 F.3d at 226* (concluding that claimant had not demonstrated that certain component of his claim was entitled to administrative expense priority and, therefore, was appropriately relegated to status as general unsecured claim); *In re Uly-Pak, Inc., 128 B.R. 763 (Bankr. S.D. Ill. 1991)* (concluding that claimant's severance pay claim did not constitute an administrative expense entitled to priority under *§ 726(a)(1)* and therefore was entitled only to general unsecured status). To do otherwise would be to risk diluting the dividend of creditors who had sustained pecuniary losses.

## II. The Trustee's Fee Request

The trustee argues that the bankruptcy court erred in denying his request for [*511] attorney's fees as the prevailing party in the underlying claims objection pursuant to *N.H. Rev. Stat. Ann. § 361-C:2*. The trustee asserts [**43] that the bankruptcy court's ruling was premature, "as the issue was not joined by either AmEx or eCast and the bankruptcy court should have provided the parties with an opportunity to obtain discovery and to present arguments on the issues."

[HN19] "It is well settled that arguments made in a perfunctory manner below are deemed waived on appeal." *F.D.I.C. v. World Univ., Inc., 978 F.2d 10, 16 (1st Cir. 1992)*. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *U.S. v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)*.

Here, the trustee did not request attorney's fees as part of his initial claims objection, but asserted it in a single paragraph in his reply to AmEx's and eCast's response to his claims objection (filed on June 6, 2006). App. Tab E, at 89. AmEx and eCast did not file any further responsive pleading and therefore did not object to or otherwise address this issue. It is unclear whether the issue was raised and/or argued at the June 13, 2009, hearing on the claims objection as the trustee has not provided a copy of the transcript on appeal. Although the [**44] parties filed post-hearing supplemental briefs, none (including the trustee) addressed the issue.

No basis exists upon which to determine that the trustee made anything other than a perfunctory argument regarding his claim for attorney's fees before the bankruptcy court. Therefore, we will not address the issue here. See *World Univ., 978 F.2d at 16*.

## CONCLUSION

Because the trustee concedes the estate's liability for the debts to AmEx and eCast, their claims must be deemed allowed. But because we conclude that AmEx and eCast failed to prove their claims were entitled to general unsecured status, they must be afforded priority under *§ 726(a)(4)*, rather than *§ 726(a)(2)*. Because the trustee has not demonstrated he raised more than a perfunctory argument regarding his request for attorney's fees below, he has waived that argument, and the bankruptcy court's denial of his request will stand.

We therefore **AFFIRM** the allowance of eCast's claim, **REVERSE** disallowance of AmEx's claim, and order that each is entitled to treatment under *§ 726(a)(4)*. We also **AFFIRM** the disallowance of the trustee's request for a fee award.

# B



LEXSEE 266 BR 200

**In re ROBERT SCOTT BOHRER, Debtor(s).**

**No. 01-10541**

**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*266 B.R. 200; 2001 Bankr. LEXIS 1187*

**August 2, 2001, Decided**

**DISPOSITION:** [**1] Subject to Bohrer's right to a full hearing, confirmation denied and this case dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Trustee objected to debtor's plan.

**OVERVIEW:** Trustee argued that the plan did not meet the disposable income test of *11 U.S.C.S. § 1325(b)(1)(B)*. Debtor argued that his failure to accurately state his monthly income was honest. The court found that the fact that debtor's understatement of income was not in bad faith did not mean that the plan had to be confirmed. The court found that confirmation was not proper but noted that debtor had the right to a full hearing.

**OUTCOME:** Confirmation of the plan was denied subject to debtor's right to a full hearing.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Estate Property > General Overview*
*Evidence > Judicial Admissions > General Overview*
[HN1] Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions. A debtor may not adopt a cavalier attitude toward his the accuracy of his schedules by arguing that they are not precise and correct.

*Bankruptcy Law > Estate Property > General Overview*
[HN2] When bankruptcy schedules are amended the old schedules do not become nullities. The only effect of amendment of a schedule is that the original schedule no longer has the binding, preclusive effect it might otherwise have. It still fully subject to consideration by the court as an evidentiary admission.

**COUNSEL:** Christopher G. Metzger, Law Offices of Christopher G. Metzger, Eureka, CA, for debtor.

**JUDGES:** Alan Jaroslovsky, U.S. Bankruptcy Judge.

**OPINION BY:** Alan Jaroslovsky

**OPINION**

[*200] *Memorandum*

In this Chapter 13 case, debtor Robert Bohrer originally scheduled his monthly expenses at $ 2,073.55. He proposed a plan which provided for a dividend of about 10% to his unsecured creditors. Upon examining Bohrer, the trustee discovered that he had understated his monthly income by several hundred dollars. In response, the debtor amended his schedules twice, first to change his monthly expenses to $ 2,143.55, and then to $ 2,322.55. Thus, even though Bohrer admits that his income is $ 430.00 per month higher than originally scheduled, his proposed plan [*201] payment is exactly the same. [1] The trustee objects, arguing that the plan does not meet the disposable income test of *§ 1325(b)(1)(B) of the Bankruptcy Code*.

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 22 of 33

Page 2

266 B.R. 200, *; 2001 Bankr. LEXIS 1187, **

Bohrer argues that his failure to accurately state his monthly income was an honest one, and the court does not find otherwise; if it did, it would dismiss the case for bad faith. However, just because his understatement of his income was not in bad faith does not mean that his plan must be confirmed. [**2] The court must still find that Bohrer's plan includes his disposable income for at least 36 months. Bohrer's own schedules show that this requirement has not been met.

Bohrer appears to suffer from a substantial misapprehension as to the nature of schedules. [HN1] Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions. *In the Matter of Gervich, 570 F.2d 247, 253 (8th Cir.1978).* A debtor may not adopt a cavalier attitude toward his the accuracy of his schedules by arguing that they are not precise and correct. *In re Duplante, 215 B.R. 444, 447n8 (9th Cir. BAP 1997).* [HN2] When schedules are amended the old schedules do not, as Bohrer seems to argue, become nullities. The only effect of amendment of a schedule is that the original schedule no longer has the binding, preclusive effect it might otherwise have. It still fully subject to consideration by the court as an evidentiary admission. *White v. Arco/Polymers, Inc., 720 F.2d 1391, 1396n5 (5th Cir. 1983).*

In this case Boher represented to the court, under penalty of perjury, that he needed no money [**3] for recreation expenses. He later amended this figure to $ 70.00 per month, and then again to $ 100.00 per month. He does not allege that either of the first two figures were mistakes. Rather, the figure was increased to cover the increased income discovered by the trustee. The early versions of Bohrer's budget establish that $ 50.00 is a reasonable amount for recreation.

Likewise, the first two versions of Bohrer's monthly expenses identified $ 200.00 for transportation. In the final version, this amount is $ 230.00. Bohrer does not argue that he forgot some item of transportation expense, but only that the figure was understated the first two times around. Considering the two earlier versions of the schedules as admissions, it appears that a reasonable figure is $ 215.00.

The trustee indicated on the record that a plan which increased the monthly payment from $ 125.00 to $ 190.00 per month would be acceptable. Bohrer then asked if he could pay the same amount over an extended period of time, and the trustee again indicated no objection. A plan incorporating either of these changes will accordingly be confirmed. However, subject to Bohrer's right to a full hearing, confirmation will [**4] be denied and this case dismissed if Bohrer does not immediately amend his plan to the trustee's satisfaction. [2]

    1   The original schedules showed a deficit. Thus, an increase in expenses of $ 250.00 per month was sufficient to offset a $ 430.00 understatement of income.

    2   Bohrer may have a full evidentiary hearing if he wishes. However, if such a hearing is held the court will consider as evidence both of the superceded versions of his schedules, and may well conclude that he must pay a monthly amount considerably greater than $ 190.00 per month in order to meet the requirements of § 1325(b)(1)(B).

[*202] Counsel for Bohrer shall submit a form of order consistent with this memorandum which the trustee has approved as to form.

Dated: August 2, 2001

Alan Jaroslovsky

U.S. Bankruptcy Judge

# C

 LexisNexis®

LEXSEE 402 BR 359

**In re: PETER A. JACOBSON and MARIA E. JACOBSON, Debtors.**

**No. 08-45120**

**UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF WASHINGTON**

*402 B.R. 359; 2009 Bankr. LEXIS 762*

**March 6, 2009, Entered on Docket**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Movant, a servicing agent for the holder of the note, sought relief from the automatic stay of *11 U.S.C.S. § 362(a)* to enforce a deed of trust on the debtors' residence. The issues were whether a "servicing agent" was the real party in interest in whose name a relief from stay motion could be brought and whether the servicing agent had standing to seek relief from stay to enforce the debtors' deed of trust.

**OVERVIEW:** The real party in interest in a relief from stay was whoever was entitled to enforce the obligation sought to be enforced. The servicing agent submitted no evidence that it was authorized to act for whomever held the note. That deficiency placed its standing in question. The only evidence the servicing agent submitted was the declaration of one of its bankruptcy specialists. The court determined that the declaration would not have withstood an objection to admissibility: there was nothing meaningful regarding the declarant's qualifications to authenticate business records, or the reliability of those records in the instant case. Nor did anything in the record establish the servicing agent's authority to enforce the debtors' note, for whomever held it, and thus to foreclose the deed of trust. The term "servicing agent" had no uniform meaning, and no definition was cited in the declaration. At a minimum, there must have been an unambiguous representation or declaration setting forth the servicing agent's authority from the present holder of the note to collect on the note and enforce the deed of trust.

**OUTCOME:** The court denied the motion.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Professional Responsibility*
*Civil Procedure > Parties > Self-Representation > General Overview*
*Civil Procedure > Counsel > General Overview*
[HN1] W.D. Wa. R. 2(g)(1) permits the court to hear represented individuals, even though their counsel is not present. The rule provides that whenever a party has appeared by attorney, he cannot thereafter appear or act in his own behalf in the cause, or take any step therein; provided, that the court may in its discretion hear a party in open court, notwithstanding the fact that he has appeared, or is represented by attorney.

*Bankruptcy Law > Practice & Proceedings > Professional Responsibility*
*Civil Procedure > Counsel > General Overview*
[HN2] See *Fed. R. Bankr. P. 9010(b)*.

*Bankruptcy Law > Practice & Proceedings > Professional Responsibility*
*Civil Procedure > Counsel > General Overview*
[HN3] An attorney must first file a notice of appearance containing the data specified in *Fed. R. Bankr. P. 9010(b)* to represent a party in a hearing.

*Bankruptcy Law > Practice & Proceedings > Professional Responsibility*

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 25 of 33

Page 2

402 B.R. 359, *; 2009 Bankr. LEXIS 762, **

*Civil Procedure > Counsel > General Overview*
[HN4] In addition to *Fed. R. Bankr. P. 9010(b)*, a local rule of the United States District Court for the Western District of Washington, which applies via Bankr. W.D. Wa. R. 9029-2, requires an attorney eligible to appear may enter an appearance in a civil case by signing any pleading or other paper described in *Fed. R. Civ. P. 5(a)* filed by or on behalf of the party the attorney represents, or by filing a Notice of Appearance. W.D. Wa. R. 2(h).

*Bankruptcy Law > Practice & Proceedings > Professional Responsibility*
*Civil Procedure > Counsel > General Overview*
[HN5] See Bankr. W.D. Wa. R. 9029-2.

*Bankruptcy Law > Practice & Proceedings > Professional Responsibility*
*Civil Procedure > Counsel > General Overview*
[HN6] See W.D. Wa. R. 2(g)(3).

*Bankruptcy Law > Practice & Proceedings > Professional Responsibility*
*Civil Procedure > Counsel > General Overview*
[HN7] See W.D. Wa. R. 2(g)(2)(B).

*Civil Procedure > Parties > Required Representation*
[HN8] Corporations must be represented by counsel in federal court.

*Bankruptcy Law > Practice & Proceedings > Professional Responsibility*
*Civil Procedure > Counsel > General Overview*
[HN9] See Bankr. W.D. Wa. R. 9013-1(e)(1).

*Bankruptcy Law > Case Administration > Administrative Powers > Stays > Relief From Stays > Procedures*
*Bankruptcy Law > Practice & Proceedings > Contested Matters*
*Civil Procedure > Parties > Real Parties in Interest > General Overview*
[HN10] *Fed. R. Bankr. P. 4001* makes stay relief a contested matter by providing that *Fed. R. Bankr. P. 9014* governs. That rule in turn applies *Fed. R. Bankr. P. 7017*, imposing *Fed. R. Civ. P. 17*'s requirement that actions be prosecuted in the name of the real party interest. The right to enforce a note on behalf of a noteholder does not convert the noteholder's agent into a real party in interest. As a general rule, a person who is an attorney-in-fact or an agent solely for the purpose of bringing suit is viewed

as a nominal rather than a real party in interest and will be required to litigate in the name of his principal rather than in his own name.

*Civil Procedure > Parties > Real Parties in Interest > General Overview*
[HN11] An action must be prosecuted in the name of the real party in interest.

*Civil Procedure > Parties > Real Parties in Interest > General Overview*
[HN12] See *Fed. R. Civ. P. 17(a)(3)*.

*Civil Procedure > Justiciability > Standing > General Overview*
[HN13] For a federal court to have jurisdiction, the litigant must have constitutional standing, which requires an injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. The question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights. Typically the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.

*Civil Procedure > Justiciability > Standing > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview*
[HN14] Constitutional standing, predicated on the "case or controversy" requirement of Article III of the Constitution, is a threshold jurisdictional requirement, and cannot be waived.

*Civil Procedure > Justiciability > Standing > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview*
[HN15] A litigant must have "prudential standing," which stems from rules of practice limiting the exercise of federal jurisdiction to further considerations such as orderly management of the judicial system.

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 26 of 33

Page 3
402 B.R. 359, *; 2009 Bankr. LEXIS 762, **

*Civil Procedure > Justiciability > Standing > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview*
[HN16] Generally, a party without the legal right under applicable substantive law to enforce the obligation at issue, or pursuing an interest outside those protected by the law invoked or abstract questions more appropriately addressed legislatively, lacks prudential standing.

*Bankruptcy Law > Case Administration > Administrative Powers > Stays > Relief From Stays > Procedures*
*Civil Procedure > Justiciability > Standing > Personal Stake*
[HN17] Under the Bankruptcy Code, a party seeking relief from stay must establish entitlement to that relief. *11 U.S.C.S. § 362(d)*. Foreclosure agents and servicers do not automatically have standing, and must show authority to act for the party which does.

*Civil Procedure > Justiciability > Standing > Personal Stake*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Foreclosures > Judicial Foreclosures*
[HN18] In Washington, only the holder of the obligation secured by the deed of trust is entitled to foreclose. *Wash. Rev. Code § 61.24.005(2)* defines "beneficiary" under a deed of trust as the holder of the instrument or document evidencing the obligations secured by the deed of trust. Having an assignment of the deed of trust is not sufficient because the security follows the obligation secured, rather than the other way around. This principle is neither new nor unique to Washington. Transfer of the note carries with it the security, without any formal assignment or delivery, or even mention of the latter.

*Bankruptcy Law > Case Administration > Administrative Powers > Stays > Relief From Stays > Procedures*
*Civil Procedure > Justiciability > Standing > Personal Stake*
[HN19] Some courts require a party moving for stay relief to provide admissible evidence tracing the identity of the various holders and servicers of the mortgage or deed of trust in question, and the holders of the note evidencing the underlying obligation.

*Evidence > Authentication > General Overview*
*Evidence > Hearsay > Exceptions > Business Records > Normal Course of Business*

[HN20] The business records exception to the hearsay rule requires that the records: (1) be made at or near the time by, or from information transmitted by, a person with knowledge; (2) pursuant to a regular practice of the business activity; (3) kept in the course of regularly conducted business activity; and (4) the source, method, or circumstances of preparation must not indicate lack of trustworthiness. These elements must be established by the testimony of a custodian or other qualified witness, and the documents must be authenticated. Specifically, the record being proffered must be shown to continue to be an accurate representation of the record that originally was created. *Fed. R. Evid. 901(a)*. A declarant authenticating business records must be qualified. The bare assertion that one works for the company and is familiar with its recordkeeping procedures is not sufficient; there needs to be enough information presented to demonstrate that the person is sufficiently knowledgeable about the subject of the testimony. The testimony must contain information warranting the conclusion that the proffered records are what they purport to be.

*Evidence > Hearsay > Exceptions > Business Records > Normal Course of Business*
[HN21] See *Fed. R. Evid. 803(6)*.

*Evidence > Authentication > General Overview*
[HN22] See *Fed. R. Evid. 901(a)*.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Negotiation, Transfer & Indorsement > Negotiation*
[HN23] See *Wash. Rev. Code § 62A.3-201*.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Enforcement > Person Entitled to Enforce*
[HN24] See *Wash. Rev. Code § 62A.3-301*.

**COUNSEL:**  [**1] For Peter A. Jacobson and Maria E. Jacobson, Debtors: Kenneth E. Rossback, Attorney at Law, Tacoma, WA.

For UBS AG, creditor: David A. McAllister, Pite Duncan, LLP, San Diego, CA.

Chapter 7 Trustee: Terrence J. Donahue, Tacoma, WA.

**JUDGES:** Philip H. Brandt, United States Bankruptcy Judge.

**OPINION BY:** Philip H. Brandt

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 27 of 33

Page 4

402 B.R. 359, *; 2009 Bankr. LEXIS 762, **

## OPINION

### [*362]  DECISION ON RELIEF FROM STAY

Before the court is a motion for relief from the automatic stay of § 362(a) [1] to enforce a deed of trust on the Debtors' residence. As it was neither brought in the name of the real party in interest, nor by anyone with standing, the motion for relief from stay will be DENIED.

> 1   Absent contrary indication, all "Code," chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23. "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "FRCP" and "FRE" references are to the Federal Rules of Civil Procedure and the Federal Rules of Evidence, respectively.
>
> "GR" references are to the Local Rules, U.S. District Court, W.D. Washington, and "LBR" to the Local Bankruptcy Rules, W.D. Washington.
>
> "RCW" references are to the Revised [**2] Code of Washington.

### I. History

Attached to the motion of "UBS AG, as servicing agent for ACT Properties, LLC ("Movant")" (docket no. 31) are unauthenticated copies of:

> 1. The adjustable rate note purportedly executed on 14 November 2009 in Elkridge, Maryland, by Debtors in favor of Castle Point Mortgage, Inc., which bears an undated "without recourse" indorsement in blank by someone identified as "VP/CFO";
>
> 2. A barely-legible copy of Debtors' deed of trust in favor of Castle Point Mortgage (as "lender"); the beneficiary is identified as Mortgage Electronic Registration Systems, Inc. ("MERS"), a separate corporation, "solely as nominee for lender and lender's successors and assigns," with an adjustable rate rider (executed in Pierce County, Washington, on the same day as the note, according to the acknowledgment);
>
> 3. An apparently unrecorded "Assignment of Mortgage" to ACT Proper-

ties, LLC, referencing the deed of trust by parties, date, and recording number, executed by a director of MERS in December of 2008, according to the acknowledgment; and

> 4. Debtors' real property and secured claims schedules (A and D, respectively, the latter identifying the secured creditor as "UBS").

The motion notes  [**3] Debtors' bankruptcy petition, filed 7 October 2008, the attendant automatic stay, and goes on to recount the history of the loan, including its transfer "to Movant," stating that Wells Fargo Document Custody "has possession" of the original note in Minneapolis, Minnesota. The narrative continues with Debtors' default and the commencement of non-judicial foreclosure proceedings, with sale set for 17 October 2008, (presumably by a predecessor in interest of ACT Properties, since it was pre-assignment; the foreclosing party is not identified). The Debtors' filing automatically stayed the foreclosure, § 362(a); the motion indicates no foreclosure activity is pending. There follows a calculation of the amounts due and lack of equity, and sketchy argument that the Movant is entitled to relief under § 362(d)(1) for lack of adequate protection.

The motion is supported by the declaration of a "bankruptcy specialist" (docket no. 32) which parrots the narrative set forth in the motion (or perhaps it is the other way around -- the text respecting the history of the transaction and documentation is virtually identical, and both make the same mistake regarding the date the [*363]  deed of trust was executed [**4] -- they both state that the deed of trust was executed 8 December 2006, while the acknowledgment shows it as 14 November 2006). Declarant, too, declares that Wells Fargo Document Custody "has possession" of the original note in Minnesota, and indicates that true copies of the note, deed of trust, and assignment are attached, but there are no exhibits to the filed declaration. The declaration was executed in Irvine, California.

No evidence is provided, nor is any assertion even made, regarding UBS AG's authority to act for the holder of the note, beyond the unelaborated statements that it is "servicing agent for ACT Properties, LLC" in the motion, and "servicing agent for ACT Properties, LLC, its successors and/or assigns" in the declaration.

Nor do the papers disclose what kind of an entity "UBS AG" is. "AG" may indicate a corporate entity from Germany, Switzerland, Liechtenstein, Austria, or perhaps elsewhere, and UBS is a major Swiss financial institution. See Nelson D. Schwartz, For Swiss banks, an Un-

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 28 of 33

Page 5

402 B.R. 359, *; 2009 Bankr. LEXIS 762, **

*comfortable Spotlight*, Int'l Herald Tribune, March 4, 2009, [2] and *UBS AG: a Short History*. [3]

> 2   available at:
>
>> http://www.iht.com/articles/2009/ 03/04/business/04swiss.php   (last visited 4  [**5] March 2009)
>
> 3   available at:
>
>> http://www.ubs.com/1/e/about/hist ory/a_short_history.html?isPopup =yes (last visited 5 March 2009).

This latter point became significant when Debtors, pro se (although they have counsel), filed their Motion to Dismiss Movant's Motion for Relief from Stay (docket no. 44), the thrust of which is that UBS transferred the security in the real property to the Central Bank of Switzerland in return for approximately $ 220,000, and referencing numerous press and internet accounts respecting the Swiss bank. Debtors do not explicate how they reach the conclusion, from news stories about the handling of toxic assets in the banking systems of this country and Switzerland, that UBS AG (or UBS AG, which only claims to service the loan for another holder) was paid an amount approximating the default alleged in the motion. That said, they raise a standing question.

UBS AG's counsel, while located in San Diego, California, is admitted to practice in this district and electronically filed the motion and supporting papers. He continued the motion once and then confirmed the motion for hearing two days prior to the calendar, also via the court's electronic filing system. A local [**6] practitioner whose role in the case was not disclosed in the docket appeared for UBS AG at the continued hearing; Debtor Peter Jacobson appeared pro se.

## II. Jurisdiction

This is a core proceeding within this court's jurisdiction. *28 U.S.C. §§ 1334(a)* and *(b)*, and *157(a)* and *(b)(2)(G); GR 7, P 1.01, Local Rules, W.D. Washington*.

## III. Issues

### A. *Appearances*

Were the parties properly represented at hearing?

### B. *Real Party in Interest*

Is a "servicing agent" the real party in interest in whose name a relief from stay motion may be brought?

### C. *Standing*

Does UBS AG or Movant have standing to seek relief from stay to enforce Debtors' deed of trust?

## [*364]  IV. Analysis

### A. *Appearances*

Debtors were and still are represented by counsel in this case. Although they filed their response to the motion pro se, they indicate having informed counsel of their intent to file their response. I infer counsel decided to argue their position. Nevertheless, because I have an independent duty to determine jurisdiction, *see* part IV.C. below, the question is before me, and Mr. Jacobson appeared at the hearing.

[HN1]  *GR  2(g)(1)* permits the court to hear represented individuals, even though their counsel is not present:

> Whenever a party has  [**7] appeared by attorney, he cannot thereafter appear or act in his own behalf in the cause, or take any step therein; provided, that the court may in its discretion hear a party in open court, notwithstanding the fact that he has appeared, or is represented by attorney.

Respecting Movants' representation at the hearing, *Rule 9010(b)* provides that:

> [HN2] [a]n attorney appearing for a party in a case under the Code *shall* file a notice of appearance with the attorney's name, office address and telephone number, unless the attorney's appearance is otherwise noted in the record.

(emphasis added). In other words, [HN3] an attorney must first file a notice of appearance containing the data specified in *Rule 9010(b)* to represent a party in a hearing.

[HN4] In addition to *Rule 9010(b)*, a local rule of the U.S. District Court for the Western District of Washington, which applies via *LBR 9029-2*, [4] requires:

> An attorney eligible to appear may enter an appearance in a civil case by sign-

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 29 of 33

Page 6

402 B.R. 359, *; 2009 Bankr. LEXIS 762, **

ing any pleading or other paper described in *Rule 5(a), Federal Rules of Civil Procedure,* filed by or on behalf of the party the attorney represents, or by filing a Notice of Appearance.

GR 2(h). No formal notice of appearance is required [**8] so long as the new attorney has somehow made his or her involvement in the case known prior to the hearing, such as by signing and filing pleadings.

    4   Which provides:

> [HN5] The Local Rules of the United States District Court for the Western District of Washington (herein "Local Rules W.D. Wash.") are rules of the United States Bankruptcy Court for the Western District of Washington, except as they may be inconsistent with Title 11, United States Code (herein "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure, or these Local Bankruptcy Rules.

But once counsel has appeared, GR 2(g)(3) provides:

> [HN6] The authority and duty of attorneys of record shall continue until there shall be a substitution of some other attorney of record, except as herein otherwise expressly provided, and shall continue after final judgment for all proper purposes.

And GR 2(g)(2)(B):

> [HN7] Where there has simply been a change or addition of counsel within the same law firm, an order of substitution is not required; the new attorney will file a Notice of Appearance and the withdrawing attorney will file a Notice of Withdrawal. However, where there is a change in counsel that effects a termination of one law office and the appearance [**9] of a new law office, the substitution must be effected . . . which requires leave of court.

And, of course, [HN8] corporations must be represented by counsel in federal court. *See Rowland v. California Men's Colony,* [*365] *506 U.S. 194, 201-02, 113 S. Ct. 716, 121 L. Ed. 2d 656 (1993).*

The careful reader will have noticed that none of the foregoing rules directly address the situation where the original attorney continues as counsel of record, but another lawyer, not of the same firm, joins for some portion of the representation. But, read together, the requirement of corporate representation and the continuing role of counsel of record preclude interloping counsel. For other attorneys not part of the same firm as record counsel to represent a party, something must be done of record. Customarily, this is accomplished by filing a notice of association, and it is common when lead counsel is distant and the use of local counsel for particular matters in the case will promote efficiency, or the new counsel provides particular expertise. Once the notice of association is served and filed, all parties to the case are aware of the changed representation, and associated counsel receives notice directly of events and filings in the case.

The [**10] practice of undisclosed "appearance attorneys" creates problems -- other parties (and the court) are sandbagged, and the Debtor, trustee, other creditors, and counsel cannot readily communicate regarding scheduling or substance. In addition to the ramifications of this practice, explored in *In re Wright, 290 B.R. 145 (Bankr. C.D. Cal. 2003)*; Hon. Jim D. Pappas, *Simple Solution = Big Problem,* 46 The [Idaho] Advocate 31 (Oct. 2003); and Neil M. Berman, *Judge, This is Not My Case . . .,* Norton Bankr. L. Adviser 3 (May 2004), the lack of formal association could raise questions about the informally-appearing attorney's authority to speak for, and make judicial admissions on behalf of, the client (the contrary suggestion would not be a promising argument).

While this defect is not dispositive, clarity of representation on the record is important to judicial economy and the orderly representation of other parties. So I will require, absent emergency or significant hardship, formal notice of association to be filed not later than the confirmation of the hearing. And there is no remedy for self-inflicted harm -- law firms undertaking distant representations must be prepared to appear or timely [**11] associate local counsel who will. As corporations must be represented by counsel in federal court, the consequence of not having counsel of record at hearing will be that that party's position may be deemed without merit. *See* LBR 9013-1(e)(1). [5] This is the flip side of Woody Allen's observation that "Eighty per cent of success is showing up" [6] -- if you (or your counsel of record if you are a corporate entity) don't, your chance of success approaches zero.

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 30 of 33

Page 7

402 B.R. 359, *; 2009 Bankr. LEXIS 762, **

5   Which provides:

> [HN9] [A]ppearance is required at all scheduled hearings. Failure to appear at the date and time appointed for hearing may be deemed by the court to be an admission that the motion, or the opposition to the motion, as the case may be, is without merit.

6   Quoted in Thomas J. Peters and Robert H. Waterman, *In Search of Excellence*, Harper & Row 1982, at 119.

In short, henceforth only counsel of record or individuals representing themselves will be heard.

### B. *Real Party in Interest*

The moving party here is UBS AG, which claims only to be a servicer for the holder of the note. It neither asserts beneficial interest in the note, nor that it could enforce the note in its own right. As noted in *In re Hwang, 396 B.R. 757, 766-67 (Bankr. C.D. Cal 2008)*, [**12] [HN10] *Rule 4001* makes [*366] stay relief a contested matter by providing that *Rule 9014* governs. That rule in turn applies *Rule 7017*, imposing *FRCP 17*'s requirement [7] that actions be prosecuted in the name of the real party interest.

> [t]he right to enforce a note on behalf of a noteholder does not convert the noteholder's agent into a real party in interest. "As a general rule, a person who is an attorney-infact or an agent solely for the purpose of bringing suit is viewed as a nominal rather than a real party in interest and will be required to litigate in the name of his principal rather than in his own name."

*Hwang, 396 B.R. at 767*, quoting 6A Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 2d § 1553.

7   Which provides in *(a)(1)*:

> [HN11] An action must be prosecuted in the name of the real party in interest. . . .

The real party in interest in relief from stay is whoever is entitled to enforce the obligation sought to be enforced. Even if a servicer or agent has authority to bring the motion on behalf of the holder, it is the holder, rather than the servicer, which must be the moving party, and so identified in the papers and in the electronic docketing done by the moving party's counsel.

It follows [**13] that orders granting relief from stay must do so to the holder of the obligation to be enforced -- not the servicer or others, or the collective "Movant," as in the proposed order UBS AG submitted. Of course, setting forth that the holder may act through agents, or may later assign or transfer the interest, e.g., "ACT Properties, LLC, and its agents, successors, and assigns," is appropriate.

If UBS AG'S motion had merit, the standing deficiency could be cured by joinder, as *FRCP 17(a)(3)*, [8] applicable via *Rules 9014* and *7017*, allows. As will be seen, joinder would not salvage this motion.

8   Which provides:

> [HN12] The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

### C. *Standing*

UBS AG has submitted no evidence that it is authorized to act for whomever holds the note. That deficiency puts its standing in question, *See In re Parrish, 326 B.R. 708, 720-21 (Bankr. N.D. Ohio 2005)*, [**14] and I have an independent duty to determine whether I have jurisdiction over matters that come before me. *FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990)*. I must therefore determine whether UBS AG (or Movant) has standing to seek relief from stay.

**1.** *Law*: [HN13] For a federal court to have jurisdiction, the litigant must have constitutional standing, which requires an injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. *United Food & Commercial Workers*

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 31 of 33

Page 8

402 B.R. 359, *; 2009 Bankr. LEXIS 762, **

*Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 551, 116 S. Ct. 1529, 134 L. Ed. 2d 758 (1996).*

> [T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a [*367] litigant's raising another person's legal rights . . . .
>
> . . . .
>
> Typically . . . the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.

*Allen v. Wright, 468 U.S. 737, 750-52, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)* (citations [**15] omitted). [HN14] Constitutional standing, predicated on the "case or controversy" requirement of Article III of the Constitution, is a threshold jurisdictional requirement, and cannot be waived. *Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co., 219 F.3d 895, 899-900 (9th Cir. 2000).*

[HN15] A litigant must also have "prudential standing," which stems from rules of practice limiting the exercise of federal jurisdiction to further considerations such as orderly management of the judicial system. *Pershing Park, 219 F.3d at 899-900; In re Godon, 275 B.R. 555, 564-565 (Bankr. E.D. Cal. 2002)* (citing *Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541-42, 106 S. Ct. 1326, 89 L. Ed. 2d 501 (1986).*

[HN16] Generally, a party without the legal right under applicable substantive law to enforce the obligation at issue, or pursuing an interest outside those protected by the law invoked or abstract questions more appropriately addressed legislatively, lacks prudential standing. *Doran v. 7-Eleven, Inc., 524 F.3d 1034, 1044 (9th Cir. 2008).*

[HN17] Under the Bankruptcy Code, a party seeking relief from stay must establish entitlement to that relief. *§ 362(d); see In re Hayes, 393 B.R. 259, 266-267 (Bankr. D. Mass. 2008).* Foreclosure agents and [**16] servicers do not automatically have standing, *In re Scott, 376 B.R. 285, 290 (Bankr. D. Idaho 2007); Hwang, 396 B.R. at 767,* and must show authority to act for the party which does.

[HN18] In Washington, only the holder of the obligation secured by the deed of trust is entitled to foreclose. *RCW 61.24.005(2)* defines "beneficiary" under a deed of trust as the holder of the instrument or document evidencing the obligations secured by the deed of trust. [9] *See also Fidelity & Deposit Co. of Maryland v. Ticor Title Ins. Co., 88 Wash. App. 64, 943 P.2d 710 (1997).* Having an assignment of the deed of trust is not sufficient, *id. at 68-69,* because the security follows the obligation secured, rather than the other way around. This principle is neither new nor unique to Washington:

> [T]ransfer of the note carries with it the security, without any formal assignment or delivery, or even mention of the latter.

*Carpenter v. Longan, 83 U.S. 271, 275, 21 L. Ed. 313 (1872).*

> 9   Which renders problematic the identification of MERS "solely as nominee . . ." as the beneficiary of Jacobsons' deed of trust.

It follows that, to have standing, UBS AG must establish its authority to act for the holder of Debtors' note.

**2. *Evidence*:** [HN19] Some [**17] courts require a party moving for stay relief to provide admissible evidence tracing the identity of the various holders and servicers of the mortgage or deed of trust in question, and the holders of the note evidencing the underlying obligation. *See Hayes, 393 B.R. at 269;* and *Parrish, 326 B.R. at 720-21.* I need not here go so far, because UBS AG's proof neither shows who presently holds Debtors' note nor its own authority.

[*368]   While business records may provide the necessary proof, [HN20] this exception to the hearsay rule [10] requires that the records (1) be made at or near the time by, or from information transmitted by, a person with knowledge; (2) pursuant to a regular practice of the business activity; (3) kept in the course of regularly conducted business activity; and (4) the source, method, or circumstances of preparation must not indicate lack of trustworthiness. These elements must be established by the testimony of a custodian or other qualified witness, and the documents must be authenticated. *In re Vinhnee, 336 B.R. 437, 444 (9th Cir. BAP 2005).* Specifically, "the [**18] record being proffered must be shown to continue to be an accurate representation of the record that originally was created." *Id.; FRE 901(a).* [11] A declarant authenticating business records must be qualified. The bare assertion that one works for the company and is familiar with its recordkeeping procedures is not sufficient: "there needs to be enough information presented to demonstrate that the person is sufficiently knowledgeable about the

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 32 of 33

Page 9

402 B.R. 359, *; 2009 Bankr. LEXIS 762, **

subject of the testimony." *Vinhnee, 336 B.R. at 448* (citation omitted). The testimony must contain information warranting the conclusion that the proffered records are what they purport to be. *Id.*

10    *FRE 803(6)* provides:

> [HN21] Records of Regularly Conducted Activity.--A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that [**19] complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

11    Which provides:

> [HN22] The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

The only evidence UBS AG has submitted is the declaration of one of its bankruptcy specialists. The initial paragraph of the declaration reads:

> I am employed as a Bankruptcy Specialist by UBS AG, as servicing agent for ACT Properties LLC, its successors and/or assigns ("Movant"). In this capacity, I am one of the custodians of the books, records, files and banking records of Movant, as those books, records, files and banking records pertain to the loans and extensions of credit by Movant to Peter A. Jacobson and Maria E. Jacobson ("Debtors"). I have personally worked on said books, records, files [**20] and banking records and, as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the Movant's business records, which were made at or about the time of the events which were recorded, and which are maintained in the ordinary course of Movant's business.

Declaration in Support . . . (docket no. 32).

One hopes the declarant is not as unsure of his own identity as this imprecision suggests: is he employed as a bankruptcy specialist by UBS AG only in its capacity as servicing agent for ACT Properties? Or for a successor or assignee of ACT? Or is he a bankruptcy specialist for UBS AG and its successors and/or assigns? Is he [*369] one of the custodians of "the books, records, files and banking records" of all of these entities? And since the motion must be brought in the name of the real party in interest; i.e., the present holder of Debtors' note, what is the relevance of a possible future successor or assignee? Or if the antecedent of "successors and/or assigns" is UBS AG, how does declarant know he will be employed by whomever it is, or have access to its records?

Setting aside for the moment that no business records are actually proffered [**21] -- the declarant recounts his conclusions, from whatever records he consulted, and we are told that he is one of the custodians, that he works on those records, that they were made at or about the time of the events recorded, and that they are maintained in the ordinary course of Movant's business. While that formulaic recitation attempts to satisfy *FRE 901(a)*, it would not withstand an objection to admissibility: there is nothing meaningful regarding the declarant's qualifications to authenticate business records, or the reliability of those records in this instance.

That reliability is questionable, given obvious errors, such as the date the Debtors executed the deed of trust and the assertion of a loan or extension of credit "by Movant" to the Jacobsons -- the lender (and the payee of their note) was Castle Point Mortgage, Inc., not included

Case 1:09-cv-02973-CMA   Document 11-1   Filed 03/03/10   USDC Colorado   Page 33 of 33

Page 10
402 B.R. 359, *; 2009 Bankr. LEXIS 762, **

in either of the compositions of "Movant" set forth in UBS AG's papers. And which of the matters he recounts are things he knows to be true of his own knowledge, and which did he gain from someone's business records? More fundamentally, ACT Properties was assigned the deed of trust just days before the motion was filed. Why should credence be [**22] given to UBS AG's records "as servicing agent for ACT Properties" respecting anything before that assignment?

But even if all of the deficiencies were overlooked or resolved in Movant's favor, one emerges from the syntactical fog into an impassable swamp. The declaration of someone in California, apparently based on business records, and perhaps predating his employer becoming servicing agent, is that Debtor's note secured by the deed of trust is in "the possession" [12] of a separate entity in Minnesota. Assuming the exhibits to the motion are authentic and are the same as those intended to have been attached to the declaration, the note is indorsed in blank. Without more, that and possession (rather than mere custody) suggests that Wells Fargo is the holder of the note. *RCW 62A.3-201* [13] and *3-301* [14]. Nothing in the record establishes on whose behalf (if other than its own) Wells Fargo Document Custody possesses the note; that (and verification of current possession and [*370] present ability to produce the original, if required) would have to come from Wells Fargo.

12   So in both the motion (at 3:11) and in the declaration (at P 4).
13   Which provides:

> [HN23]   (a)   "Negotiation" means a transfer of possession, [**23] whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder.
>
> (b) Except for negotiation by a remitter, if an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder. If an instrument is payable to bearer, it may be negotiated by transfer of possession alone.

14   Which provides:

> [HN24] "Person entitled to enforce" an instrument means (i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to *RCW 62A.3-309* or *62A.3-418(d)*. A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument.

Nor does anything in the record establish UBS AG's authority to enforce the Debtors' note, for whomever holds it; and thus to foreclose the deed of trust. The declaration states that UBS AG is "servicing agent," a term with no uniform meaning, and no definition cited. At a minimum, there must be an unambiguous [**24] representation or declaration setting forth the servicer's authority from the present holder of the note to collect on the note and enforce the deed of trust. If questioned, the servicer must be able to produce and authenticate that authority.

UBS AG has not shown that it has standing to bring the motion for relief from stay or authority to act for whomever does.

## V. CONCLUSION

As the motion was not brought in the name of the real party in interest, nor has standing to bring it been established, it will be **DENIED**.

/s/ Philip H. Brandt

Philip H. Brandt

United States Bankruptcy Judge